Filed 11/28/22 In re J.W. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re J.W. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. J.W. et al., Defendants and Appellants. | E079038 (Super.Ct.Nos. J270359 & J270360) OPINION |

APPEAL from the Superior Court of San Bernardino County. Annemarie G. Pace, Judge. Affirmed.

Melissa A. Chaitin, under appointment by the Court of Appeal, for Defendant and Appellant, J.W.

Konrad S. Lee, under appointment by the Court of Appeal, for Defendant and Appellant, B.W.

1

Tom Bunton, County Counsel, and David Guardado, Deputy County Counsel, for Plaintiff and Respondent.

## INTRODUCTION

A juvenile court terminated the parental rights of defendants and appellants B.W. (father) and J.W. (mother) as to their children, Ja.W. and Jo.W. (the children). Father and mother have filed separate briefs on appeal, and they both contend the court erred in summarily denying their respective section 388 petitions, and erred in finding the beneficial parental relationship exception to termination of parental rights inapplicable. (Welf. & Inst. Code,[1] § 366.26, subd. (c)(1)(B)(i).) We affirm.

## PROCEDURAL BACKGROUND

On April 5, 2017, the San Bernardino County Children and Family Services (CFS) filed a section 300 petition on behalf of the children.[2] Jo.W. was two years old at the time, and Ja.W. was three. The petition alleged that the children came within section 300, subdivisions (b) (failure to protect) and (g) (no provision for support). Specifically, the petition alleged that father and mother (the parents) both engaged in domestic violence in the presence of the children, that father had a history of substance abuse, and that father was incarcerated and was unable to provide the children with support.

---

[1] All further statutory references will be to the Welfare and Institutions Code unless otherwise indicated.

[2] CFS filed a separate petition for each child; however, since the petitions contain the same allegations, we will simply refer to them as one petition.

The social worker filed a detention report and stated that the family came to CFS's attention due to concerns of domestic violence between mother and father.[3] The social worker reported that there were a number of witnesses to incidents of domestic violence involving both parents fighting. Witnesses heard loud arguing coming from the home and saw father outside calling mother horrible names. Witnesses reported the children were present when the arguing occurred. The social worker further reported there was an incident in which mother was hitting father and tried to run him over with a car. Several witnesses saw the incident and the children crying and screaming for their mom to stop. The social worker further reported that witnesses had seen both mother and father attempt to hit one another. The maternal grandmother sustained a broken arm in an altercation with father while attempting to intervene between her daughter and son-in-law. The children were present when these incidents of violence occurred, and none of the three adults appeared to be aware of the need to protect them.

The social worker contacted mother and expressed concern that one of the children could be seriously injured if they were around the domestic violence. Mother said, "[N]o one has to worry about us; we are fine and in a good place right now."

The court held a detention hearing on April 6, 2017. Mother appeared but father did not since he was in custody. The court detained the children in foster care.

---

[3] The detention report lists four of the parents' children, Ja.W., Jo.W., B.W, Jr., and N.W. However, this appeal only concerns Ja.W. and Jo.W.

3

*Jurisdiction/Disposition*

The social worker filed a jurisdiction/disposition report on May 2, 2017, recommending that the court sustain the petition, remove the children, and provide the parents with reunification services. The social worker reported that mother had filed a restraining order against father, and there was also a criminal protective order in place between them. Yet, when the parents were interviewed, they both denied any history of domestic violence in their relationship. The social worker further reported that the parents' two older children both said they frequently heard the parents yelling and fighting. Additionally, the police were called to the home multiple times since November 2016. The parents denied that the children had been present at any time arguments became physical, but the social worker stated there could be no doubt the children were exposed to the fighting that was happening in the home. Furthermore, the social worker reported that father was convicted of misdemeanor battery on a spouse/cohabitant in a case filed on January 4, 2017. The system indicated he was also arrested for the same charge on April 3, 2017, but was released on April 6, 2017.

The social worker reported that the parents had been married for eight years. Mother denied the children actually saw her and father fight but admitted they likely heard the arguments. Mother said she understood that even hearing the fighting was not good for the children, but denied that her children had been harmed by the environment.

The social worker recommended a case plan for mother to include participating in a domestic violence program, individual counseling, and a special education class. Father's case plan included the same requirements plus an anger management program.

4

The court held a jurisdiction hearing on May 4, 2017, and both parents appeared. The court found the section 300, subdivision (b) allegations true and sustained the petition. It continued the matter for the disposition hearing. The court subsequently held the disposition hearing on June 5, 2017, and found father to be the presumed father of the children. It then declared the children dependents, removed them from the parents' custody, and ordered reunification services for the parents.

*Six-month Status Review*

The social worker filed a six-month status review report on October 26, 2017, recommending that the parents' services continue. The social worker reported that Jo.W. and Ja.W. were placed in different foster homes. The social worker further reported that mother stated she did not wish to continue in a marriage with her husband and that she filed for divorce. However, the social worker reported that mother actually was continuing to see father and engage in domestic violence, and mother would call the sheriff for assistance when she and father fought. The social worker opined that mother had not benefited from her services, and stated that mother did not take any responsibility but appeared to deflect all of the issues to father.

The social worker reported that she met with father, and he tried to paint a picture of how well mother was doing, so the children could be returned to the home. However, he also stated that mother had an issue with deceiving the department and him, while the children were suffering.

The social worker concluded that both parents were not taking responsibility for their actions and were not allowing themselves to benefit from the services that were

5

provided. They had not made significant progress in their domestic violence program, they continued in the cycle of domestic violence, and they did not fully understand that their relationship was unhealthy and would continue to place the children at risk for neglect and/or abuse.

As to visitation, the social worker reported that the parents had separate supervised visits once a week for two hours. Mother visited the children consistently, but was late for most visits. She was appropriate, and the children reportedly enjoyed the visits. Father was in jail several times throughout this reporting period and was not able to see the children consistently.

The court held a six-month review hearing on November 6, 2017, and continued the parents' services.

*Twelve-month Status Review*

The social worker filed a 12-month status review report on April 9, 2018, recommending that the court continue mother's services, but terminate father's services. Mother was about to complete a second domestic violence program and said that she now realized what a healthy relationship was, and she had no intention of reuniting with father. Mother continued to visit the children weekly for two hours with no concerns noted.

The social worker reported that father had been incarcerated since October 2017 and was to remain in custody until June 2018. Father did not visit the children during this reporting period.

The court held a 12-month status review hearing on May 4, 2018. Father objected to the termination of his services, stating that he was participating in services while in custody and that he was going to be released the following month. The court noted one of its biggest concerns was that father was in custody for violating a domestic violence restraining order, and the court assumed it was for unauthorized contact with mother. Given that father had already had a year of services, the court stated it was not inclined to continue his services, especially in light of his conduct. The court adopted the recommended findings and orders, including the finding that father failed to participate regularly and make substantive progress in his case plan and that his services be terminated. The court continued mother's services and authorized unsupervised visits.

*Eighteen-month Status Review*

The social worker filed an 18-month status review report on September 21, 2018, recommending that mother's reunification services be terminated and the permanent plan of permanent placement be implemented. The social worker reported that father was released from custody, and he had advised her that he and mother had several conversations in which she said she loved him and wanted to be in a relationship with him. However, he said she would then get mad and hang the phone up on him. Father said mother was very manipulative and would lie to get people to believe her. The social worker interviewed mother, and mother denied communicating with father. The social worker asked about her telling father she wanted to get back together with him. Mother admitted she told father she loved him, but said, "It is just crazy talk."

7

The social worker reported that mother completed her domestic violence program, but it did not appear she had benefited as she minimized her role with father and their conversations about getting back together. The social worker was concerned with mother not being forthright about father, as mother said she did not have any contact with father due to him trying to kill her. The social worker found that statement to be false and noted that father said mother would add money to his account while he was in jail. Furthermore, after he was released from custody, both mother and father called the social worker and said they were arguing about their past issues. At the same time, mother continued to deny any type of negative behavior with father and continued to state that she was not responsible for him.

As to visitation, the social worker reported that mother had begun unsupervised visits with the children for up to six hours. The children were happy to see her; however, the social worker noted they ended visits with no issues. Father recently began visiting the children with no concerns. The social worker further noted that the children had a change of placement in June 2018 and were now in the same foster placement.

The court held an 18-month hearing on October 1, 2018. It ordered the parents not to discuss their relationship or the case with the children at visits, and it authorized CFS to return mother's visits to supervised if she made inappropriate comments.

On December 4, 2018, the social worker filed an additional information to the court memorandum (CFS 6.7) and reported that father was arrested on November 28, 2018, for violating a restraining order. Father told the social worker that mother picked him up, and they drove around talking about getting back together, but he refused to do

8

so. Then mother alerted the police to their location so that he would be arrested. Father also told the social worker that he and mother had communicated throughout the case, and mother had made plans with him to not complete his services so that she could get the children. The social worker recommended the court find that mother failed to make substantive progress in her case plan and order her services to be terminated, a section 366.26 hearing be set, and adoption be implemented as the permanent plan.

The court held a contested 18-month hearing on December 5, 2018. County counsel asked the court to reduce visitation. She said father's visits had been sporadic due to him being in and out of custody. The court terminated mother's services, set a section 366.26 hearing, and ordered adoption as the permanent plan. It reduced father's visits to once a month and ordered mother's visits to be once a week for two hours.

*Section 366.26*

The social worker filed a section 366.26 report on March 26, 2019, and reported that CFS received a referral alleging abuse/neglect of the children in their foster home. The children switched placements again in January 2019; however, the caregiver requested that they be removed the following month. The social worker stated that the children would need to be moved to another home and that CFS would be assessing relatives for potential placement. Consequently, the previously recommended permanent plan of adoption was no longer appropriate. No adoptive parent had been identified, so the social worker recommended a Permanent Planned Living Arrangement (PPLA) with the goal of legal guardianship.

9

As to visitation, the social worker reported that mother was visiting the children; however, she had not seen them since their placement was changed in January 2019. There was no information reported regarding father's visits with the children.

The court held a section 366.26 hearing on April 4, 2019. It ordered the permanent plan as recommended and set a permanent plan review (PPR) for October 4, 2019.

*PPR Status Review*

The social worker filed a PPR report on September 27, 2019, and reported that mother had two supervised visits a month that went well. Father had one supervised visit a month.

The court held a hearing on October 4, 2019, and continued the children in foster care. It also continued the parents' visits at twice a month for mother and once a month for father.

On October 1, 2020, the social worker filed a report stating the children were now in separate homes with different caregivers. She recommended that the court set a section 366.26 hearing for Jo.W. and order adoption as the permanent plan. As for Ja.W., the recommendation was still for a PPLA with legal guardianship with her current caregiver as the goal.

At a hearing on October 2, 2020, the court followed the recommendations, ordered adoption as the permanent plan for Jo.W., and set a section 366.26 hearing for February 1, 2021.

10

*Section 366.26 for Jo.W.*

The social worker filed a section 366.26 report on January 21, 2021, and recommended the court continue the matter for 180 days to allow for an assessment of Jo.W's caretaker. The social worker reported that mother had two scheduled visits a month, but missed three visits during this reporting period. In recent months, she became more consistent. However, father was inconsistent with visits and missed six visits during this reporting period.

The court held a hearing on February 1, 2021, and continued the matter to June 1, 2021. At the June 1, 2021 hearing, the court set a PPR for October 4, 2021.

On March 22, 2021, the social worker reported that she found a potential adoptive home for the children together. She moved them into the same home on April 23, 2021, and the caretakers expressed their desire to adopt the children.

On May 20, 2021, the social worker reported that father had become more consistent with his visits and was now more engaged. The children looked forward to the time they spent with him.

On June 1, 2021, the court held a hearing and ordered the plan of foster care with the permanent plan of adoption and continued the matter to October 4, 2021.

In a status review report filed on September 23, 2021, the social worker reported that mother missed four visits during that reporting period. Father was very consistent with his visits and only missed one scheduled visit. Since he lived at an assisted living drug treatment facility, his visits typically took place in the CFS office. The social worker reported that the children looked forward to his visits. The social worker also

11

reported that the children had bonded with their current caregivers, called them "mom and dad," and wanted to be adopted by them. Furthermore, the likelihood of the children returning to the parents was not likely due to father's current living situation and mother's lack of interest in participating in the children's lives beyond biweekly visits.

The court held a PPR hearing on October 4, 2021, and adopted the recommended findings and orders, including that father have supervised visits twice a month. It continued the children as dependents, ordered adoption as the permanent plan, and set a section 366.26 hearing.

*Section 366.26 and Section 388 Petitions*

The social worker filed a section 366.26 report on January 20, 2022, recommending that parental rights be terminated and the permanent plan of adoption be implemented. The social worker reported that the children and the prospective adoptive parents had developed a mutual strong bond and attachment, the children were thriving with them, and the prospective adoptive parents were committed to raising the children to adulthood and had the ability to provide them with a stable home and unconditional love.

On March 17, 2022, mother filed a section 388 petition, requesting that the court reinstate her services, increase her visitation, and transition the children to her home. As to changed circumstances, she alleged that: (1) she had been in counseling since June 2, 2021, and had benefitted from it; (2) she moved to a different city and father no longer knew where she lived, and they had separate visits; and (3) she had remained single so her children would know they were her priority. As to best interests of the children, mother alleged that the risk of domestic violence between her and father had been

12

ameliorated, and she had been engaging in services to ensure the children would be safe with her. Mother also alleged the children begged to see her more, and she had consistently asked for increased visitation. Mother attached a personal statement to her petition, alleging that the social worker's statements about her visits being inconsistent were misleading since cancelled visits were due to the foster parents or CFS. Mother also alleged that she moved in January 2019 and was a teacher with a stable job and an appropriate home.

Furthermore, mother alleged she had engaged in therapy to deal with past trauma from severe domestic violence. She said the children were in placement because she had allowed herself "to continue to be victimized by the father." Mother alleged it was in the children's best interests to work through their own trauma with her and to transition back home "to heal together." She attached a letter from Desert Rose Trauma Recovery, stating that she participated in 15 sessions revolved around building coping skills, enhancing communication, and reviewing skills learned in additional classes and programs. Mother also attached a certificate of completion of a domestic violence victim impact program and a letter verifying she was attending another victim impact class and would complete it on October 6, 2021. Additionally, she attached personal references from several coworkers.

The court summarily denied mother's petition because it did not state new evidence or a change of circumstances, and because it did not promote the best interests of the children.

13

On April 15, 2022, father filed a section 388 petition requesting that the court reinstate his services, order unsupervised visits, and have his home assessed for return of the children.[4] As to changed circumstances, father alleged that he had completed an outpatient program and a number of programs through Inroads Recovery, Gibson House for Men, and New Hope Village. He also alleged that he had maintained stable employment and housing and had visited the children consistently. As to best interests, father similarly alleged that he had stabilized his circumstances by completing a number of services and maintaining stable housing and employment; he also regularly visited the children, the visits went well, the children were bonded with him, and they deserved to have their father in their life. Father attached a personal statement declaring that he completed different services on his own, including parenting classes, anger management, substance abuse, rehabilitation, and outpatient services. He also attached documentation verifying his completion of various programs.

The court also summarily denied father's petition because it did not state new evidence or a change of circumstances, and because it did not promote the best interests of the children.

The court held a contested section 366.26 hearing on May 17, 2022. Mother and father both objected to the termination of parental rights, arguing the beneficial parental bond exception applied. Father asked to testify and stated that, at the beginning of the case, he was given weekly visitation but occasionally missed visits. Then, after his

---

[4] Father filed separate petitions for each child. However, since they contain the same allegations, we will simply refer to them as a single petition.

services were terminated in 2018, he was still given weekly visitation, but over the past year only visited 10 to 12 times.  Father said the children were happy to see him at visits, and he felt like they were bonded.  He also testified that they liked the foster parents and were eager to go home at the end of the visits.

The court recognized that the parents loved the children, but stated the beneficial parental bond exception required regular visitation and contact, and it was not sure it could find the parents met that prong, based on the record.  As to the second and third prongs, the court found that the parents certainly did not meet their burden to show a substantial and positive emotional attachment such that termination of parental rights would be detrimental, especially when balanced against the adoptive placement with the foster parents.  The court then terminated parental rights.

## DISCUSSION

### I. The Court Properly Denied the Parents' Section 388 Petitions

Father argues the court erred in summarily denying his section 388 petition.  He claims he should have been granted an evidentiary hearing since he made the requisite prima facie showing that his circumstances had changed, and that offering him reunification services would be in the children's best interests.  Mother makes the same claims as to her petition. We conclude the court properly denied both of their petitions.

### A. *The Court Did Not Abuse its Discretion*

"A juvenile court order may be changed, modified or set aside under section 388 if the petitioner establishes by a preponderance of the evidence that (1) new evidence or changed circumstances exist and (2) the proposed change would promote the best

15

interests of the child." (*In re Zachary G.* (1999) 77 Cal.App.4th 799, 806 (*Zachary G.*).) "Thus, the parent must sufficiently allege *both* a change in circumstances or new evidence *and* the promotion of the child's best interests." (*In re G.B.* (2014) 227 Cal.App.4th 1147, 1157 (*G.B.*).) "A parent need only make a prima facie showing of these elements to trigger the right to a hearing on a section 388 petition and the petition should be liberally construed in favor of granting a hearing to consider the parent's request. [Citation.] [¶] However, if the liberally construed allegations of the petition do not make a prima facie showing of changed circumstances and that the proposed change would promote the best interests of the child, the court need not order a hearing on the petition." (*Zachary G.*, at p. 806.) "The prima facie requirement is not met unless the facts alleged, if supported by evidence given credit at the hearing, would sustain a favorable decision on the petition." (*Ibid.*) "While the petition must be liberally construed in favor of its sufficiency [citation], the allegations must nonetheless describe specifically how the petition will advance the child's best interests." (*G.B.*, at p. 1157.) More than general conclusory allegations are required to make this showing, even when the petition is liberally construed. (*In re Edward H.* (1996) 43 Cal.App.4th 584, 593.) "We review the juvenile court's summary denial of a section 388 petition for abuse of discretion." (*In re Anthony W.* (2001) 87 Cal.App.4th 246, 250.)

1. *Father's Section 388 Petition*

Father's section 388 petition sought the provision of more reunification services, unsupervised visits, and a home assessment for the return of the children. The juvenile court did not abuse its discretion in summarily denying his petition, as father was unable

to demonstrate that a changed order was in the children's best interests. As to changed circumstances, the petition alleged that he completed various services, including an outpatient program, trauma recovery, and an interactive journaling program. He also alleged that he had maintained stable employment and housing and had visited the children consistently. However, we note that the children were removed, in part, because the parents engaged in domestic violence. Father was in and out of jail for domestic violence after the case opened, and he was in custody during the 12-month hearing when the court terminated his services. At that time, the court noted that domestic violence was one its biggest concerns. It then chose not to continue father's services, since he had already had a year of services and was currently in custody for violating a domestic violence restraining order. Significantly, although father's petition alleged that he had completed various services, none of them involved domestic violence. Considering father did not address the court's main concern that led to the termination of his services, the court properly found that his petition failed to show a change of circumstances.

Furthermore, as to best interests, father essentially alleged the same things he alleged for changed circumstances—that he had completed a number of services, maintained stable housing and employment, and regular visitation with the children. He added that the visits went well, the children were bonded with him, and they deserved to have their father in their lives. However, the petition did not allege *how* the proposed changes would promote the children's best interests, especially considering father failed to even acknowledge the court's concern with his domestic violence. (*G.B.*, *supra*, 227

17

Cal.App.4th at p. 1157.) Accordingly, there was no need for the court to order a hearing on the petition. (*Zachary G.*, *supra*, 77 Cal.App.4th at p. 806.)

Even on appeal, father fails to show it was in the children's best interests to provide him with more services, unsupervised visits, and a home assessment. He reiterates that he had stable housing, consistent visits,[5] and a bond with his children, and that he had completed various programs. However, he again fails to even mention domestic violence. The court properly denied his petition.[6]

2. *Mother's Section 388 Petition*

Mother joins in father's arguments with respect to his section 388 petition and adds her own arguments with respect to her petition. She also claims she made a prima facie showing of both changed circumstances and best interests of the children. In her petition, mother requested that the court reinstate her services, increase the frequency of her visits, and transition the children to her home. As to changed circumstances, she alleged that: (1) she had been in counseling since June 2021 and had benefitted from it; (2) she moved to a different city and father no longer knew where she lived, and they had

---

[5] We note that father's own testimony at the contested section 366.26 hearing showed that he did not have consistent visitation.

[6] We note father's brief claims that the court abused its discretion in not granting him a hearing on his petition "when [it] was already going to hear his evidence of parental bond at the upcoming section 366.26 hearing." However, the allegations in his section 388 petition were separate and distinct from the beneficial parental relationship exception to the termination of parental rights. Moreover, at the time the court was considering his section 388 petition, father had not yet objected on the basis of the beneficial parental relationship exception. Thus, the court had no knowledge that father would be presenting evidence at the section 366.26 hearing.

18

separate visits; and (3) she had remained single so her children would know they were her priority. We note the social worker recommended the termination of mother's services because, although she had completed a domestic violence program, mother did not benefit from it. Her section 388 petition indicated she continued to view father as the sole reason the children were removed, as she said in her attached personal statement that her kids were in placement "because [she] allowed [herself] to continue to be victimized by the father." Mother alleged that she completed a domestic violence victim impact program and was attending another victim impact class. Thus, she apparently saw herself as a victim only. However, the children were removed, in part, because mother herself actually perpetrated domestic violence in front of the children. Her petition offered no information showing that she had addressed concerns related to her own status as a perpetrator of domestic violence.

Moreover, as to best interests, mother alleged that the risk of domestic violence between her and father had been ameliorated, and she had been engaging in services to ensure that the children would be safe with her. However, mother's petition failed to demonstrate *how* the proposed changes would be in the children's best interests, especially since she had not taken any responsibility for her part in their removal. In her personal statement, mother alleged: "It is in the best interest of my children to work through their own trauma *with me* and to transition back home and for *all of us* to heal *together*." (Emphasis added.) This statement demonstrates her lack of awareness that she was one of the perpetrators of the domestic violence and part of the reason the children had to be removed. Thus, contrary to her claim, mother's petition failed to

19

demonstrate that she had ameliorated the issue that brought the children within the court's jurisdiction.

Ultimately, in view of mother's and father's history of domestic violence and the failure of either of them to even acknowledge they were perpetrators of domestic violence, their petitions did not show that the children's best interests would be promoted by their requests. Accordingly, we cannot say the court abused its discretion in summarily denying their petitions. (*G.B.*, *supra*, 227 Cal.App.4th at p. 1157.)

## II. The Beneficial Parental Relationship Exception Did Not Apply

Father contends the court erred in not applying the beneficial parental relationship exception under section 366.26, subdivision (c)(1)(B)(i). He claims the court failed to consider the elements required by *In re Caden C.* (2021) 11 Cal.5th 614 (*Caden C.*). Specifically, he contends that CFS gave the court scant information on the nature and quality of the children's relationship with him or their attitude about adoption, and that the court applied impermissible factors to its analysis. Father argues that we should reverse the termination of parental rights and remand the matter to the juvenile court, and mother simply joins in his argument. We conclude the court properly determined the beneficial parental relationship exception did not apply.

A. *Relevant Law*

At a section 366.26 hearing, the juvenile court selects a permanent plan for the dependent child. (*In re K.P.* (2012) 203 Cal.App.4th 614, 620.) Permanent plans include adoption, guardianship, and long-term foster care. (*In re S.B.* (2008) 164 Cal.App.4th 289, 296.) "Adoption, where possible, is the permanent plan preferred by the

20

Legislature." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 573 (*Autumn H.*).) A permanent plan of adoption necessarily involves termination of the biological parents' parental rights to the child. (*Id.* at p. 574.)

In selecting a permanent plan for the child, the court is first required to determine whether the child is likely to be adopted. (See § 366.26, subd. (c)(1).) If the court finds, based on clear and convincing evidence, that the child is likely to be adopted, and if there has been a previous court determination, by a preponderance of the evidence, that it would be detrimental to the child to return the child to his or her parent or guardian (§§ 366.21, 366.22), then the court is required to terminate parental rights and select adoption as the child's permanent plan, unless the parent shows that termination of parental rights would be detrimental to the child under at least one of several statutory exceptions to the adoption preference. (*Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 249; § 366.26, subd. (c)(1)(B)(i)-(vi).) "The statutory exceptions merely permit the court, in *exceptional circumstances* [citation], to choose an option other than the norm, which remains adoption." (*In re Celine R.* (2003) 31 Cal.4th 45, 53.) The parental-benefit exception applies where the court finds a "compelling reason" for determining that termination of parental rights would be detrimental to the child because, in the words of the statute, "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).)

Our Supreme Court recently clarified the proper application of the parental-benefit exception and, in doing so, discerned "three elements the parent must prove to establish

21

the exception: (1) regular *visitation and contact*, and (2) a *relationship*, the continuation of which would *benefit* the child such that (3) the termination of parental rights would be *detrimental* to the child." (*Caden C.*, *supra*, 11 Cal.5th at p. 631.) As *Caden C.* indicates, the second and third elements of the exception are inextricably connected.

The *Autumn H.* court recognized this connection when it interpreted "the 'benefit from continuing the [parent/child] relationship' exception to mean the relationship promotes the well-being of the child *to such a degree as to outweigh* the well-being the child would gain in a permanent home with new, adoptive parents. In other words, the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*Autumn H.*, 27 Cal.App.4th at p. 575, italics added.)

We review the juvenile court's findings on the first two elements of the parental-benefit exception for substantial evidence. (*Caden C.*, *supra*, 11 Cal.5th at pp. 639-640.) "The determination that the parent has visited and maintained contact with the child . . . is essentially a factual determination. It's likewise essentially a factual determination whether the relationship is such that the child would benefit from continuing it." (*Ibid.*) The third element—whether termination of parental rights would be detrimental to the child—is "somewhat different" in that it requires the court to "assess[] what the child's life would be like in an adoptive home without the parent in his life." (*Id.* at p. 640.)

22

"The court makes the assessment by weighing the harm [to the child] of losing the relationship against the benefits [to the child] of placement in a new, adoptive home. And so, the ultimate decision—whether termination of parental rights would be detrimental to the child due to the child's relationship with [the] parent—is discretionary and properly reviewed for abuse of discretion." (*Ibid.*)

A court abuses its discretion only when it " ' "has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination." ' " (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318.) A reviewing court should find an abuse of discretion, "only ' "if" ' " it finds that no judge could reasonably have made the decision that the judge did, when all of the evidence is viewed most favorably in support of the judge's decision. (*In re Robert L.* (1993) 21 Cal.App.4th 1057, 1067.)

B. *Father Failed to Maintain Regular Visitation*

Contrary to father's claim, the court properly considered the *Caden C.* factors before terminating parental rights. Father first claims the court did not make a finding that visitation did not occur, and he claims that the record established he visited to the extent required to meet this first prong. The record belies his claim. The court recognized that the parents loved the children, but stated the beneficial parental bond exception required regular visitation and contact. It then stated, "I don't know that, based on this record, I could even find that first prong applies." The record shows father was initially granted weekly visitation, and the six-month status review report indicates that he was inconsistent in his visitation. He was in custody and failed to visit at all during the next reporting period. In the 18-month review report, the social worker stated that

23

father only "recently began visiting the children." In the section 366.26 report filed on January 21, 2021, the social worker reported that father was inconsistent with visits and missed six visits during that reporting period. Furthermore, at the most recent contested section 366.26 hearing, father testified that he was given weekly visitation, but over the past year visited only 10 to 12 times. Thus, his own testimony showed that he had not maintained regular visitation.[7]

C. *Father Failed to Establish the Children Would Benefit from Continuing the Relationship Such That Termination of His Parental Rights Would Be Detrimental*

In addition to his visits being insufficient to meet the first prong of the beneficial parental relationship exception, father failed to establish that the continuation of the relationship would benefit the children such that the termination of parental rights would be detrimental to them. (*Caden C.*, *supra*, 11 Cal. 5th at pp. 631-632; § 366.26, subd. (c)(1)(B)(i).) As *Caden C.* indicates, the second and third elements of the exception are inextricably connected. (See *Caden C.*, at pp. 631.)

As to the second and third elements, the court stated, "I don't find that the parents have met their burden to demonstrate either one. [¶] I don't believe that they do have a substantial attachment to the parents, even by the father's own testimony." The record supports the court's finding. Essentially, father failed to maintain regular visitation with the children during the dependency, and consequently, there was little evidence of a

---

[7] It appears that at the time of the hearing, the visitation order was for supervised visits twice a month, not weekly. Nonetheless, father's testimony still showed he had not maintained regular visitation, as he had only visited 10 to 12 times.

24

substantial attachment between him and the children.  Furthermore, father has not proffered any evidence to support a finding that he had a "substantial, positive emotional attachment [with the children] such that [they] would be greatly harmed" if the relationship was severed.  (*Autumn H., supra*, 27 Cal.App.4th at p. 575.)  In fact, the evidence showed the opposite.  When father did have visits, he brought toys and played with the children, and there were no concerns.  However, as he testified, the children liked the foster parents and were eager to go home at the end of the visits.

Moreover, the evidence showed the children were bonded with the prospective adoptive parents.  The children and the prospective adoptive parents had developed a mutual strong bond and attachment.  The children called them "mom and dad," were thriving in the home, and expressly said they wanted to be adopted by the prospective adoptive parents.  The prospective adoptive parents were committed to raising the children to adulthood and had the ability to provide them with a stable home and unconditional love.

Therefore, neither the record nor father's testimony contained any evidence to demonstrate that his relationship with the children promoted their well-being "to such a degree as to outweigh the well-being the child[ren] would gain in a permanent home with new, adoptive parents." (*Autumn H., supra*, 27 Cal.App.4th at p. 575.)

On appeal, father claims it was impermissible for the juvenile court to consider that the children "had a bonded relationship" with the prospective adoptive parents.  On the contrary, this was "a crucial aspect of the trial court's responsibility." (*Caden C., supra*, 11 Cal. 5th at pp. 631.)  "[I]n assessing whether termination would be *detrimental*,

25

the trial court must decide whether the harm from severing the child's relationship with the parent outweighs the benefit to the child of placement in a new adoptive home." (*Id.* at p. 632.) Thus, the court here properly considered the benefits of the children's prospective adoptive home and stated, "I really don't have any evidence that terminating parental rights would be detrimental when balanced against the adoptive placement with the foster parents."

Father additionally argues "the record holds some evidence" to support the finding of a bond between him and the children. The evidence he points to essentially shows that on the days he did visit, he brought food and toys and played with the children, was appropriate with them, and they were happy to see him. However, this evidence fails to demonstrate that his relationship promoted the children's well-being "to such a degree as to outweigh the well-being the child[ren] would gain in a permanent home with new, adoptive parents." (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.)

Father further claims the court's finding concerning his relationship with the children was "insufficient" because the court "failed to fully consider any of the slew of factors required by *Caden C.*" We observe that the court in *Caden C.* stated, "[T]he focus is the child. And the relationship *may* be shaped by a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.' " (*Caden C., supra*, 11 Cal. 5th at p. 632, italics added.) There is no apparent requirement for the court articulate each of these factors in its ruling, as father appears to

26

claim. In any event, information on these factors would have been contained in the record, which the court indicated it considered.

Father further complains that CFS gave the court scant information on the nature and quality of the children's relationship with him or about the children's attitude about adoption. However, the social worker did report that the children enjoyed their visits with him, but they wanted to be adopted by the prospective adoptive parents.

Father additionally argues that the court erred when it "failed to ensure that it had enough evidence of the children's relationship with [him] to make the necessary findings under a *Caden C.* analysis." He cites *In re D.P.* (2022) 76 Cal.App.5th 153 (*D.P.*), claiming that the court in that case reversed a termination of parental rights, in part, because the juvenile court failed to "ensure the social services agency provided adequate reports regarding the nature and quali[t]y of a child's relationship for section 366.26 purposes." However, the court in *D.P.* reversed the order terminating parental rights because it "[found] some evidentiary support for each element of the beneficial parental relationship exception." (*D.P.*, *supra*, 76 Cal.App.5th at p. 167.) In contrast, the court here did not find evidentiary support for any of the elements of the exception.

Ultimately, father had the burden to prove the beneficial parental relationship exception applied, and he simply failed to do so. (*Caden C.*, *supra*, 11 Cal. 5th at p. 636 ["the parent asserting the parental benefit exception must show, by a preponderance of the evidence, three things. . . ."].) Father could not meet the first prong of the *Caden C.* analysis, since he failed to maintain regular visitation, as documented by the social worker's reports and confirmed by his own testimony. The court could have found the

beneficial parental exception inapplicable based on this factor alone. (*Ibid*.) Moreover, he failed to show that the children had a substantial, emotional attachment to him such that they would benefit from continuing the relationship, and that terminating the relationship would be detrimental to them when balanced against the benefit of an adoptive home. (*Ibid*.) Therefore, the court properly declined to apply the beneficial parental relationship exception under section 366.26, subdivision (c)(1)(B)(i). Since mother has joined in father's arguments as to the applicability of the beneficial parental relationship as to her, we also conclude that the court did not err in declining to apply it as to her.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

FIELDS _____
                                                                            J.

We concur:

RAMIREZ _____
                        P. J.

McKINSTER _____
                        J.